IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **DONNA BINETTI, Individually and on behalf of a class of all other persons similarly situated,** | )<br>)<br>)<br>)<br>) |
| **Plaintiff,** | ) CIVIL ACTION NO. 06 Civ. 1732 (KMK)<br>) |
| v. | )<br>) District Judge: Hon. Kenneth M. Karas |
| **WASHINGTON MUTUAL BANK, f/k/a WASHINGTON MUTUAL BANK, FA,** | )<br>)<br>)<br>) |
| **Defendant.** | ) |

**JOINT DECLARATION OF STEVEN L. WITTELS AND JEREMY HEISLER
IN SUPPORT OF PLAINTIFF'S UNOPPOSED MOTION FOR
(1) FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT;
(2) ATTORNEYS' FEES AND EXPENSES; (3) SERVICE PAYMENT
TO CLASS REPRESENTATIVE; AND (4) ENTRY OF JUDGMENT**

Steven L. Wittels and Jeremy Heisler, being duly sworn depose and say as follows:

1.      Steven L. Wittels and Jeremy Heisler are founding partners in the law firm of Sanford Wittels & Heisler, LLP and co-lead counsel for the settlement class preliminarily approved by this Court on December 19, 2007.[1]  Based on Messrs. Wittels' and Heisler's active participation and supervision in all material aspects of the prosecution and settlement of this action, they have personal knowledge of the matters set forth in this certification, unless stated otherwise.

2.      Mssrs. Wittels and Heisler make this Declaration in support of Plaintiff's unopposed motion for: (a) final approval of the class action settlement, which creates a

---

[1] See Exhibit 1 to Appendix of Exhibits ("Appendix"), Order Preliminarily Approving the Class Settlement

settlement fund of approximately $1,575,000; (b) attorneys' fees in the sum of $395,707.58 and expenses of $11,792.42; (c) a $2,500 service payment to the class representative; and (d) entry of the proposed Judgment and Order of Dismissal with Prejudice.[2]

### Introduction to the Proposed Settlement and Relief Sought by this Motion

3.      Plaintiff's motion seeks final approval of the Settlement of this breach of contract and consumer fraud class action that has come after approximately two years of active litigation (including a dispositive motion to dismiss), hard-fought arm's length negotiations, multiple mediation sessions, settlement practice and administration, and confirmatory discovery and analysis.

4.      Plaintiff Donna Binetti ("Plaintiff") sued Defendant Washington Mutual Bank ("WMB" or the "Bank") individually and on behalf of a class of other similarly situated coop borrowers.  The complaint alleges that WMB assessed additional per diem interest beyond the closing date when the class members paid off or refinanced their loans.  Plaintiff, on behalf of the class, alleges that WMB's interest "overcharges" violated the terms of Defendant-Bank's loan agreements – which expressly provided that interest would be charged only "until the full amount of the principal has been paid" – and thus constituted a breach of contract and unfair business practices in violation of New York's consumer fraud statute (General Business Law, § 349(a)).

5.      On August 2 and 3, 2006, Judge Colleen McMahon denied WMB's motion to dismiss the complaint, rejecting Defendant's assertion that Plaintiff's claims were federally preempted.  Nevertheless, thereafter Defendant refused to admit any wrongdoing, contested liability, and pressed the validity of numerous potentially fatal

---

[2] See Exhibit 2, [Proposed] Final Judgment and Order of Dismissal with Prejudice.

defenses to Plaintiff's action. Both sides recognized the risks they faced from continued litigation and entered into negotiations.

6. After more than one year of rigorous negotiations, the parties have reached a Settlement Agreement, which has been preliminary approved by the Court and is herewith submitted for its final approval. As described herein, the proposed settlement sum, including attorneys' fees and costs to Plaintiff's counsel and a $2,500 incentive fee to Ms. Binetti, has a potential total value to the class of $1,985,000. Moreover, the value of the Settlement to the class exceeds 80% of the estimated potential recovery at trial. Confirmatory discovery provided by WMB as well as analysis by Plaintiff's accounting expert corroborates the value and favorability of the Settlement.

## I.    Lead Counsel's Background

7. Jeremy Heisler graduated *magna cum laude* from Brooklyn Law School in 1979 where he was an editor of the Law Review. Mr. Heisler was an Appellate Law Assistant for the Appellate Term, First Department during 1980-1981. Mr. Heisler has been a member in good standing of the New York State bar since January 1980 and the bar of the Southern District of New York since March 1980.

8. Steven Wittels graduated The University of California at Berkeley (Boalt Hall) in 1984 with highest honors on his class action thesis. After graduation from Boalt Hall, Mr. Wittels joined the New York office of Milberg, Weiss, Bershad, Specthrie & Lerach, then the nation's foremost class action law firm. Mr. Wittels has been a member in good standing of the New York State bar since 1984.[3]

9. From its formation in 2004, the law firm of Sanford Wittels & Heisler, LLP has been and is significantly involved in civil rights and consumer fraud class action

---

[3] See Appendix Exhibit 3, Class Counsel Qualifications.

litigation. The firm is "AV" rated. Steven Wittels has served as lead counsel in approximately 50 class actions around the United States, generating millions of dollars in recoveries to class members. From 1981, Jeremy Heisler has been involved in a wide variety of class action litigations and has prosecuted over 50 class action suits, winning substantial recoveries for class members.

## II. Background of the Litigation

### (A) Facts Specific to Plaintiff Donna Binetti

10. On October 24, 2002, in conjunction with her purchase of shares of a cooperative ("coop") corporation and associated lease and occupancy of a coop apartment, Plaintiff Donna Binetti entered into a loan agreement with Defendant WMB. Under the agreement, WMB lent Plaintiff $123,707.75 toward the purchase price with the shares pledged as loan security. WMB would assess interest "on the unpaid principal" at the fixed yearly rate of 5.5% "until the full amount of the principal has been paid." While the loan was written for a term of fifteen years, the agreement specified that Plaintiff would not have to pay any penalties or fees for early termination.

11. In September 2005, Plaintiff advised WMB in writing of her intention to sell her coop shares and related interest in the apartment to a third-party buyer. On November 14, 2005, Defendant sent a Demand/Payoff Statement indicating the amount of the principal and interest that she would owe as of November 21, 2005 and which was to be paid to WMB in order to terminate the loan. Plaintiff responded by letter, dated November 16, 2005, stating that WMB "has incorrectly requested interest on the subject Co-op loan through November 21, 2005 when the closing is set for November 18, 2005."

12. However, WMB refused to recalculate the interest due and compelled Ms. Binetti to pay the additional three days of interest in order to release the loan and deliver

4

the pledged coop shares. As a result, Ms. Binetti paid $47.25 in extra interest. In assessing these charges, Plaintiff alleges, WMB violated the terms of its loan agreement with Ms. Binetti, which provided that interest would accrue only "until the full amount of the principal has been paid."

    **(B)**    **Plaintiff Commences Suit**

13.    Following pre-complaint investigation by Counsel, Plaintiff Donna Binetti instituted a class action against Defendant WMB on March 3, 2006 in the United States District Court for the Southern District of New York[4]. Ms. Binetti sought to represent a class of WMB coop borrowers whom Defendant-Bank improperly charged additional per diem interest following the full payment and closure of their loans.

    **(C)**    **WMB's Motion to Dismiss the Complaint**

14.    On June 26, 2006, Defendant moved to dismiss the complaint on the ground that federal preemption barred Plaintiff's suit. Specifically, Defendant argued that pursuant to the Home Owner's Loan Act (HOLA) of 1933 (12 U.S.C. § 1461, et. seq.) and its implementing regulation, 12 C.F.R. § 560.2, the federal Office of Thrift Supervision ("OTS") "expressly has occupied the entire field of regulation with respect to the lending operations of federal savings associations," including the assessment of interest and fees. The purpose of this express preemption was to provide for uniform federal regulatory standards free from interference by state courts and legislatures. Defendant further argued that under OTS rulemaking opinions and relevant federal and state precedents, this preemption extended to Plaintiff's generally applicable claims for breach of contract and consumer fraud, as these claims would have "more than an incidental impact on WMB's lending operations" and thus "effectively seek to regulate in

---

[4] See Exhibit 4 attached, the March 3, 2006 Class Action Complaint.

5

a specific area that federal law exclusively occupies." In sum, as quoted from its reply brief, Defendant contended that Plaintiff's complaint "seeks to do precisely what Section 560.2 forbids: to dictate through state law how many days of interest WMB may assess on pre-paid coop loans."

**(D)** **Plaintiff's Opposition to WMB's Motion to Dismiss**

15. In response to this motion, Plaintiff filed opposition papers on July 20, 2006 after extensive research and analysis of statutory, judicial, and regulatory law. Plaintiff essentially argued that it was not directly or indirectly attempting to regulate WMB's lending operations – including the assessment of interest – but merely seeking to enforce the terms of the bargain Defendant had made. In the event that the state law claims were preempted, there would be no federal cause of action for Plaintiff and the class members to redress their grievances for contractual violations and consumer fraud; however, HOLA was enacted in 1933 as relief for home owners affected by the Depression and was not intended to immunize lenders for unscrupulous business practices.

16. Plaintiff noted the presumption against preemption of an action, and specifically argued that contract law and consumer protection are the time-honored domain of the states. In fact, these traditional police powers were expressly reserved for state action by 12 C.F.R. § 560.2(c) – which permits the application of such laws "to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of [the regulations]" – and relevant OTS opinions stating that "State laws prohibiting deceptive acts and practices in the course of commerce" are not preempted. Accordingly, in Plaintiff's analysis, courts have permitted consumer protection lawsuits against lenders to proceed, particularly when the allegedly deceptive practices were associated with a defendant's breach of its own voluntary

6

contract. In line with these precedents, Plaintiff argued, the application of her facially neutral state law claims would have no more than an incidental effect on WMB's federally regulated lending operations. Plaintiff further distinguished several cases and opinions cited by WMB as they did not involve analogous facts – namely, the extension of general commercial protections to a defendant who merely happened to be a lender.

### (E)     Judge McMahon's Denial of WMB's Motion to Dismiss

17.     Following oral argument on August 2, 2006, Judge Colleen McMahon denied WMB's motion to dismiss Plaintiff's breach of contract claim and "wholly-derivative" unjust enrichment claim, reserving judgment as to whether the claim under New York's consumer fraud statute was federally preempted. Judge McMahon reasoned that "New York law did not dictate the terms of the contract at issue, or require the parties to enter it" and that its application to interpret and enforce the contract would not imply the state regulation of a federal lender. "Furthermore, the Court found it persuasive that in the absence of an analogous federal cause of action, the Bank would be completely insulated from liability for its breach if the Court were to find plaintiff's claim preempted."

18.     On August 3, 2006, Judge McMahon issued a published order denying WMB's motion to dismiss the consumer fraud action. Reconciling potentially conflicting precedent, she concluded that the pursuit of Plaintiff's claim was permitted by Section 560.2 and clarifying OTS opinions. Judge McMahon agreed with Plaintiff that the effect of New York's consumer fraud law upon lending institutions was incidental to its primary purpose of instilling ethical business practices across all industries. Furthermore, the statute had not been used in practice to set substantive standards for the lending operations of these institutions. Therefore, the application of general law in the case at bar would not conflict

with the federal purpose of maintaining uniform regulatory standards, but rather enforce "the basic norms that undergird commercial practices."

### (F) Subsequent Litigation Activity

19. Following Judge McMahon's order, Plaintiff served various discovery requests on WMB, including document requests, interrogatories, and notices of depositions. Litigation activity also continued over several months of settlement negotiations.

## III. The Dangers Confronting Both Parties if Litigation Continued

### (A) Risks of Litigation

20. The Bank challenged the viability of Plaintiff's case, arguing that federal preemption mandated dismissal. Appeal on these grounds would have consumed considerable time and resources and undermined the certainty and promptness of relief. Unquestionably, the Bank would have also raised numerous arguments against a motion by Plaintiff for class certification, including a claimed lack of commonality.

21. However, Plaintiff had defeated Defendant's motion to dismiss on the grounds of preemption in a well-supported decision by Judge Colleen McMahon, <u>Binetti v. Washington Mutual Bank</u>, 446 F. Supp.2d 217 (S.D.N.Y. 2006). Plaintiff's counsel also believed that this suit typified the kind of mass wrong the class action device is designed to remedy. Plaintiff and defendant-Bank both recognized that continued litigation presented serious risks to both parties and agreed to mediate this suit.

### (B) The Mortgage Crisis and WMB's Financial Insecurity

22. During the course of negotiating and finalizing the settlement, Plaintiff became aware of reports that WMB had been seriously affected by the sub-prime mortgage crisis – which had brought down other banks – and had been placed in a precarious financial position.

23. In particular, the financial press reported that WMB had suffered "extraordinary mortgage-related losses" due to heavy mortgage exposure – constituting of approximately 71% of its total loans. As a result, the Bank has declared multibillion dollar losses from loan defaults, including $1.87 billion in the fourth quarter of 2007 alone, and expects further similar losses in 2008. Its stock steadily plummeted beginning in approximately July 2007, dropping to a 12-year low of $8.72 per share in March 2008 – down slightly over 80 percent from its 52-week high of $44.66. Furthermore, WMB has laid off more than 3,000 workers in recent months and closed well over half of its home loan centers. Its short-term and long-term credit and bond ratings have been lowered by Standard & Poor's and Moody's. Losses continue to come in higher than estimated, and it is has been predicted that, even if the Bank survives, its profitability will not "begin to recover until 2010." These developments have caused rampant concern and speculation about WMB's financial future, including its possible collapse as well as a potential bailout by a larger bank or by the federal government.[5]

**IV.   Mediation and Settlement**

   **(A)   The Parties Agree to Mediate the Lawsuit**

24. In September 2006, the attorneys for Plaintiff and WMB decided to mediate this case for the purpose of achieving a fair resolution of the lawsuit.

---

[5]   See, e.g. http://www.cfo.com/article.cfm/10807751/c_10807964?f=home_todayinfinance; http://marketplace.publicradio.org/display/web/2008/03/20/midsized_banks; http://seattletimes.nwsource.com/html/localnews/2004268046_apwashingtonmutualbondrating.html; http://www.helium.com/items/871246-washington-mutual-americas-largest; http://tampahomessold.blogspot.com/2007/12/mortgage-crisis-forces-big-cuts-at.html, attached as Exhibit 5 hereto; see further additional articles annexed as Exhibit 5.

**(B)    The First Mediation Session**

25.    The parties engaged in an all-day session before an experienced AAA mediator, Michael D. Young, on December 6, 2006. They did not succeed in reaching a settlement on that occasion.

**(C)    Months of Negotiations**

26.    The parties continued to engage in extensive discussions over the next several months. During the course of these negotiations, several demands and counteroffers were exchanged; however, the parties remained well apart in their positions.

**(D)    The Second Mediation Session**

27.    On May 15, 2007, the parties engaged in a second all-day session before mediator Young and were able to narrow the gap between their positions, coming closer to a settlement. Further negotiations allowed the parties to eventually reach a settlement.

**(E)    Drafting Settlement Documents**

28.    During the next several months, the parties engaged in an intensive process of drafting the relevant settlement documents, including resolving remaining disputes and issues regarding the terms and language of the Settlement and ironing out differences as they arose. Ultimately, the parties finalized the Agreement, concurring as to all of the provisions of the Settlement and the form and content of the relevant documents including but not limited to class notices.[6]

**(F)    Terms of the Settlement**

29.    The Settlement provides for a payment of $35 to be made to each claimant from the Plaintiff Class who was charged extra per diem interest on a coop loan, for a

---

[6] See Exhibit 6, the November 30, 2007 Executed Settlement Agreement; see Exhibit 7, the long form Class Notice and Claim Form.

10

total potential settlement sum of approximately $1,575,000 for the approximately 45,000 class members.[7]  In addition, Defendant WMB represents that it has modified or will modify its practices to refrain from assessing interest beyond the closing date of its coop loans.  Furthermore, WMB agreed to confirmatory discovery, to consist of a targeted document production and the deposition of a person with knowledge, regarding: 1) the composition of the Settlement Class; and (2) WMB's calculation and representation for settlement purposes of a mean average "overcharge" of per diem interest.  Finally, the Settlement provides that Plaintiff's counsel will seek attorney's fees and expenses in an amount not to exceed $407,500 as well as an incentive payment of $2,500 to Ms. Binetti as class representative, and that Defendant will not oppose these applications.

### (G) Benefits to Plaintiff and Class Members — The Settlement Constitutes 81% of WMB's Anticipated Potential Liability

30.    Defendant's potential liability under the Settlement Agreement – excluding the provision for attorney's fees and costs and the incentive payment to Ms. Binetti – represents 81 percent of its likely exposure of $1,945,350 were litigation to proceed.  This figure is derived by multiplying the number of class members (approximately 45,000) by (a) the average per diem extra interest ($30.88, as represented by WMB) and (b) the estimated average number of days of extra interest assessed per class member (1.4, assuming that 20 percent of loans closed on each day of the week).[8]  Furthermore, under these calculations, the $35 awards to individual class members represent 81 percent of the average estimated overpayment of $43.23.

---

[7] Defendant WMB will pay for the costs of the claims administration process.

[8] Note that extra interest was charged until the next business day and that borrowers whose loans closed on a Friday, such as Ms. Binetti, were assessed three additional days of interest.
  Thus, even it were established at trial that 35 percent of loans closed on a Friday, the settlement would still represent two-thirds of Defendant's potential liability of $2,362,320.

31.     In arriving at this favorable resolution, Plaintiff and Class Counsel recognized the expense and length of a trial and potential appellate process, and further acknowledged that both certification of the class and success on the merits remain mired in a miasma of uncertainty.  Class Counsel was mindful of and recognized the inherent problems of proof under, and alleged defenses to, the class claims asserted in this action. Therefore, Plaintiff and Class Counsel determined that the Settlement is in the best interest of Plaintiff and the Settlement Class.

**(H)     The Class Responds Positively to the Settlement –
         There Are No Objections**

32.     To effectuate the settlement, the Claims Administrator mailed 36,088 notice packets with claim forms to class members identified in WMB's databases as having closed co-op loans during the relevant period.  The Claims Administrator also mailed 78,032 postcard notices to other individuals in the Mailing Group – namely persons who closed real estate loans on property located in New York City and Westchester which were not coded as coop loans but a substantial percentage of which were believed based upon WMB's knowledge and calculations to likely to consist of coop loans.  **There were no objectors and approximately 85 request(s) for exclusion.[9]** Many of those requesting exclusion were not members of the class because they did not have co-op loans with WMB. Further, 1,517 of class members' claim forms have been approved.

This uniform positive reaction tends to confirm Class Counsel's assessment of the settlement terms.

**(I)     Confirmatory Discovery**

33.     As provided in the Settlement Agreement the parties engaged in

---

[9] See Appendix Exhibit 8, Declaration of Claims Administrator.

12

confirmatory discovery in order to substantiate the data produced by WMB and relied upon in reaching the settlement. During this process, WMB disclosed documents and information regarding its data collection and extraction methods and procedures; furthermore, on March 18, 2008, Plaintiff's counsel took the deposition of Jei Nagamatsu, an individual with knowledge of these matters as well as familiarity with WMB's information systems.

34. The data provided during this confirmatory discovery process was reviewed by Plaintiff's accounting expert, Dr. Eli Bartov, Professor of Accounting and the Director of the Doctoral Accounting program at New York University, School Stern of Business. Dr. Bartov's independent analysis corroborates WMB's representations regarding the individual and collective damages to the class members, and verifies that the benefits made available through the settlement agreement represent approximately 81 percent of WMB's total estimated exposure. It is Dr. Bartov's professional opinion that the settlement provides a fair and adequate remedy to the class, as well as to its individual members. See Certification of Professor Eli Bartov in Support of Final Approval, filed separately herewith.

**(J)   Compelling Reasons Why the Settlement Warrants Final Approval**

35. The settlement reached is especially favorable when compared with the likelihood of success on the merits and the burdens of protracted proceedings, both on the litigants and on the courts. Defendant-Bank denies all charges of wrongdoing or liability of any kind whatsoever asserted or which would have been asserted in this action and has asserted and would continue to assert various defenses to the claims asserted in this action. Defendant-Bank was further likely to raise arguments against class certification.

13

36.     This Settlement was the product of extensive meetings, negotiations, and analysis by experienced Class Counsel, and two spirited mediation sessions before experienced mediator Michael D. Young.  Further litigation would have reduced the amount of resources available, resulting in the Settlement Class obtaining substantially less.  The Settlement represents a successful resolution of complex claims against Defendant, which was achieved only after Class Counsel undertook considerable efforts.  Among other things, Class Counsel drafted comprehensive original and amended complaints and conducted an analysis of potential class damages; researched the law on each cause of action; successfully opposed a dispositive motion to dismiss on federal preemption grounds; and successfully negotiated this favorable settlement for the Class after participating in extensive arm's-length settlement negotiations, including two full-day mediations.

37.     Class Counsel is experienced in both deceptive trade practices and class action law, has been approved as class action counsel in numerous state and federal class actions, and believes the settlement is fair and reasonable to the settlement class.  Furthermore, an experienced accounting expert performed an independent analysis of the settlement and also believes it to be fair and reasonable.  The issues before the court in this case are complex, and, if fully litigated, will likely result in protracted litigation, appeals, and continued uncertainty as to outcome.

## V.     Reasons For Granting The Plaintiff's Fee and Expense Request

38.     The Settlement Agreement provides for $407,500 in combined expenses and attorneys' fees.  Plaintiffs' counsel have incurred $11,792.42 in expenses.[10]  They

---

[10] See Exhibit 9, Itemized Case Expenses incurred by Sanford Wittels & Heisler, LLP in connection with Binetti v. Washington Mutual Bank.

14

now move for $395,707.58 as attorneys' fees.[11] These fees and expenses are not to be drawn from the settlement fund but are separate and in addition to the common fund. The attorneys' fee request of $395,707.58 represents a little over 20 percent of the monetary value of the approximately $1,983,000 in relief made available to the class members by the settlement. The fees requested are entirely consistent with awards in other cases; in fact they are substantially less than percentages typically approved by courts. (See Plaintiff's Memorandum of Law, Point II).

39. Plaintiffs' attorneys and staff expended more than 916 hours in spearheading this lawsuit to a successful culmination. Their "lodestar" to date—time expended, multiplied by hourly rates—equals $511,560.00, which is approximately $116,000 higher than the $395,707.58 fee applied for herein. Thus, Plaintiffs are not requesting a multiplier.

40. The fee request does not request compensation for future services to be performed, including attendance at the fairness hearing and responding to class members' inquiries.

41. Plaintiff incurred $11,792.42 in expenses to prosecute this suit and is entitled to reimbursement for that sum. This amount includes the fees for the professional mediator, Michael D. Young., as well as the cost of retaining accounting experts.

42. Current hourly rates for the two partners of Sanford Wittels & Heisler, LLP who handled the litigation are as follows:

    a. Jeremy Heisler - $650

    b. Steven Wittels - $625

---

[11] See Exhibit 10, Bill and Time Records for Services Rendered for attorneys and staff of Sanford Wittels & Heisler, LLP.

43. Recently, in a judgment in April 2007 handed down by the Northern District of New York, Murphy v. Super Steel Schenectady, Inc., 06-cv-0480 (Gary L. Sharpe, J.), the court approved similar hourly rates for Messrs. Heisler, Wittels and Sanford for settlement of a racial discrimination employment class action. In a further judgment in January 2008, Rosenberg v. IKON, No. 05-cv-09131-PAC, Judge Paul Crotty of this District approved a fee application by Messrs. Heisler, Wittels and Sanford that relied upon similar rates.

44. In Brody v. Catell, 2007 N.Y, Misc. Lexis 4647 (Sup. Ct. Kings Co. 2007), Justice Demarest approved a $350,000 legal fee to plaintiff's attorneys, Weiss & Lurie, notwithstanding that the Brody suit achieved only equitable and no monetary relief. The Court utilized, inter alia, the following hourly rates for Weiss & Lurie, plaintiff's New York based counsel:

**Brody v. Catell, Index No. 008835/2006 (Supr. Ct. Kings Co.)**

**Weiss & Lurie**

**Time Report from Inception to April 12, 2007**

P=Partner; A=Associate; PL=Paralegal

| NAME | STATUS | HOURLY RATE | HOURS | TOTAL LODESTAR |
|---|---|---|---|---|
| Joseph A. Weiss | P | $745.00 | 126.75 | $94,428.75 |
| James E. Tullman | A | $610.00 | 27.75 | $16,622.50 |
| Mark D. Smilow | A | $595.00 | 272.75 | $162,286.25 |

(Attached to Memorandum of Law as Exhibit 1.)

45. Consideration of the specific factors weighed by courts in this Circuit in considering fee requests in similar cases counsels in favor of granting the requested fee.

16

46.     First, the settlement clearly confers substantial benefits on members of the Settlement Class.

47.     The benefits of the settlement were achieved in the face of significant litigation risks and without the expense and burden of lengthy trial and appellate proceedings.  Settlement Class counsel thoroughly and carefully assessed the litigation and collection risks in this case. We therefore negotiated a settlement that maximized the Class' recovery and preserved Class resources that might otherwise have been wasted on the prosecution of uncertain claims and lost to the Class.

48.     Second, society has an interest in encouraging such actions and in vindicating the rights of claimants who would not have the financial wherewithal to bring individual actions, given that the prosecution of consumer fraud claims involving small individual damages is not economical.  As the Federal Rules and the courts universally recognize, it is good public policy to encourage litigation that aggregates claims that, but for the class action device, might never have been brought.

49.     Third, the fact that Settlement Class counsel undertook this case on a contingent fee basis argues strongly for approving the requested fee.  Counsel undertook this case without any assurance whatsoever that they would ever be paid, or compensated for the expenses they had to advance to prosecute the case.  And in fact, the fees sought are less than the lodestar counsel incurred in this case.

50.     Fourth, Class Counsel has rendered valuable services to the class.  Class counsel engaged in substantial factual, statistical and legal investigation and analysis to determine the strengths and weaknesses of the claims in the Class Action Complaint. The hard-fought and ultimately successful settlement negotiations conducted by Class counsel achieved a substantial benefit for the Settlement Class.  Counsel determined that

this settlement is in the best interests of the Class and is the most efficient and risk-free method to achieve a substantial recovery on the claims asserted on behalf of the class.

51. Fifth, the issues in this case are complex. Preparing the Class Action Complaint required Class Counsel to analyze numerous complex legal and factual issues. Preparation of the mediation statement, analysis of potential damages and consultation with experts demanded that Plaintiff's counsel exercise their experience, skill and creativity to the maximum extent. The factual and legal complexities of this case warrant an award of the requested fee both because Class Counsel should be rewarded for having to address the many complex issues this case has posed, and for saving the Court and the parties the burden and cost of having to litigate these questions to conclusion.

52. Sixth, the expertise, experience and conduct of Settlement Class counsel during this litigation also warrant an award of the requested fee. Settlement Class counsel are experienced in the conduct of class action litigation, and their litigation expertise is evident in the result obtained in this case, which, as discussed above, confers substantial benefits on the Settlement Class in the face of significant litigation risks. Settlement Class Counsel have conducted themselves ably and professionally throughout this litigation and have served the interests of the Class to the best of their abilities.

Dated: April 7, 2008

_____
Steven L. Wittels

_____
Jeremy Heisler